SHEPHERD *vs.* GUERNSEY and COLLIER.

The holders of the protested notes of an insolvent banking association, under the provisions of the general banking law, are not entitled to a preference in payment, out of the funds in the hands of the comptroller for the security of the circulating notes of the association, over the other creditors whose notes have not been protested; but all the holders of circulating notes of the insolvent association are entitled to be paid rateably.

Equality, among creditors having a common right to payment out of a fund provided for the benefit of all, is a settled principle of equity.

THIS was an application to dissolve an injunction, which October 19. restrained the comptroller from giving a preference in payment to the holders of protested notes of an insolvent banking association, over the holders of notes of the association which had not been so protested. The funds in the hands of the comptroller were the proceeds of stocks deposited with him, by the Bank of Western New-York at Rochester, for the security of all the holders of its circulating notes, according to the provisions of the general banking law of 1838. That bank stopped payment, and some of its notes were protested, and the protests were filed in the office of the comptroller in February or March, 1841; after which time it had wholly neglected to redeem any of its circulating notes, and was hopelessly insolvent. Several creditors, who held the circulating notes of the association at the time of its failure, had them duly protested for non-payment and caused the protests to be filed in the office of the comptroller. They thereupon claimed a preference in payment over notes subsequently protested, and over those which had not been protested; upon the construction which had been given to the general banking law by the late comptroller. And this bill was filed, by one of the holders of the circulating notes of the association, to restrain the giving of such preference, and to have the fund applied to the payment of all the notes rateably and equally. The present comptroller, upon being served with the injunction and subpœna, gave notice to the holders of the

1841.

Shepherd
v.
Guernsey.

protested notes that he did not intend to defend the suit, and that such of them as wished to claim a preference must employ counsel and defend it at their own expense. This motion to dissolve the injunction was, therefore, made in the name of the comptroller, by the counsel for the holders of protested notes who claimed such preference in payment.

*W. S. Johnson,* for the complainant.

*J. V. L. Pruyn & M. T. Reynolds,* for the defendants.

THE CHANCELLOR. The only question raised in this case by the counsel of either party is, whether the holders of protested notes of an insolvent association, organized under the general banking law, are legally and equitably entitled to a preference in payment, out of the fund pledged to the comptroller for the payment of all the circulating notes of the bank ; or whether all the holders of its circulating notes are entitled to participate equally, and rateably, in case there is a deficiency in the fund to pay all such notes in full ?

The original act of 1838, under which this claim of preference arises, is obscure in many of its provisions ; and it has more than once been found necessary to attempt to improve it by amendments. I think, however, from the whole act taken together, that it was the intention of the legislature to make the stocks, and the bonds and mortgages, transferred to the comptroller by a banking association, a common fund for the security of all the circulating notes of the institution which upon their face purported to have been so secured. The last clause of the 5th section of the act, shows it was the intention of the legislature to have the circulating notes of these associations at all times fully secured, either by stocks or by bonds and mortgages and stocks together. In giving directions to the comptroller, therefore, to make provision for the payment of all the circulating notes of an association

which had suffered any of its notes to be protested, out of the fund pledged for the payment of such circulating notes, the legislature does not appear to have contemplated the contingency of the fund being found insufficient to pay all such notes in full.  And if the language of the statute is not so clear and explicit as to render it certain that they intended the holders of the protested notes should be paid in full, in the event which has happened, in preference to the holders of notes not so protested, it is a proper case for the application of those equitable principles which are constantly acted upon by this court in cases of the like nature.

The 4th section of the act of 1838 provides, that in case of the protest of any of the circulating notes of a banking association, for non-payment, upon filing such protest in the office of the comptroller, he shall give notice to the makers of the protested notes to pay the same ; and if they are not paid within ten days thereafter, unless he is satisfied there is a good defence to the payment of the protested notes, he shall immediately give public notice that *all the circulating notes issued by such association* will be redeemed, out of the trust funds in his hands for that purpose.  Thus far, this section is in strict accordance with the principle of natural equity and justice, that where a common fund is provided for the benefit or security of several persons each is entitled to his rateable proportion thereof, in case of a deficiency in the fund to satisfy the equal claims of all in full. But the fourth section further declares, that it shall be lawful for the comptroller to apply the trust funds, belonging to the makers of the protested notes, to the payment and redemption of such notes, and to adopt such measures for the payment of all the circulating notes of the bank as will, in his opinion, most effectually prevent loss to the holders thereof.  No one can doubt that, by this clause of the section, it is equally the duty of the comptroller to provide for the payment of the notes not protested as of those which are.  But the counsel for the holders of the protested notes insist, that because the payment of such notes is

first mentioned they are to be fully paid, in preference to the others, in case of a deficiency; and that, even as between the holders of protested notes, those which were first protested are entitled to a preference over others which were subsequently protested. Such, however, is not the ordinary rule of construction which is adopted by courts of justice in similar cases.

In the common case of a direction, in the will of a testator, to pay several pecuniary legacies out of his estate, if it happens that the fund provided for the payment of such legacies is not sufficient to satisfy all, each legacy must abate rateably. And the executor is not at liberty to pay the first legatee named in the will in full, although the payment of that legacy was first directed by the testator. The presumption, in such cases, is that the testator intended that all the legatees should be paid equally. Such presumption of intended equality will not be repelled by any ambiguous expressions in the will, but must be allowed to prevail unless the will contains unequivocal evidence of the testator's intention to give some of the legatees a preference, in case the fund should be found to be insufficient to pay all. Thus in *Brown* v. *Allen*, (1 *Vern. Rep.* 31,) Lord Nottingham held, that where a testator gives several pecuniary legacies, as £100 to one and £50 to another, although he directs the legacy of £100 to be paid *in the first place*, yet if the fund falls short that legacy must abate proportionably. The same principle of construction was recognized by Lord Hardwick, in *Blower* v. *Merret*, (2 *Ves. sen.* 420.) And in the more recent case of *Beeston* v. *Booth*, (4 *Mad. Rep.* 169,) Sir John Leach held, that the expressions, in a will, " I direct that my executors shall, in the first place pay to A. in the next place to B. and then to C." &c., were not evidence of an intention that the first should be paid in full, in case of a deficiency in the fund; as they did not necessarily import any thing more than the order of payment, out of the first monies which the executor should have that might be applicable to the payment of legacies. That those expressions were,

therefore, consistent with the presumed intention of the testator that all the legatees should be equally paid, in their order.

I am not prepared to say that expressions as strong as those, if used in an assignment for the benefit of creditors, or in a legislative act, might not be sufficient to indicate an intention to give a preferable claim upon the fund, as well as a priority in the order of payment. These decisions, therefore, are merely referred to for the purpose of showing the strength of the principle, that equality among persons having a common right to payment out of a fund provided for the benefit of all is equity, and the length to which courts of justice have gone to sustain that principle and to give it its full effect. The principle, therefore, ought not to be departed from, in this case, without clear evidence of an intention to give to one creditor a preference in payment over another. And such evidence I have not been able to find in any of the provisions of the act of April 1838.

The 11th section of that act does, indeed, direct the payment of all bills or notes as to which default has been made in payment. But it contains no indication of an intention on the part of the legislature, that none but protested bills should be paid, or that those which were first protested should be paid first in full, in case of a deficiency. On the contrary, this section appears to be based upon the principle that a neglect, by a banking association, to pay any of its protested notes, for ten days after notice to pay them has been given by the comptroller, in the manner specified in the fourth section, is a failure of the bank; and that thereby the institution is in default as to the paying of all its notes then in circulation.

But whatever may be the precise meaning of the 11th section of the act, I am satisfied it never could have been the intention of the legislature, by any of the provisions of this statute, to give a preference to bankers and brokers over other members of the community, who had received the circulating notes of these associations in the ordinary course

of business. Yet such must, unquestionably, be the effect of giving a preference to the notes first protested, as claimed in this case. For the brokers and bankers, who in the course of their business would become possessed of large amounts of the circulating notes, would alone be capable of sustaining the expense of a journey to the bank, the costs of a protest, and the trouble of filing it in the comptroller's office in time to obtain a priority. And they would probably be the first of the bill holders who would be apprized of the failure of the association to redeem its circulating notes.

Although the language of the general banking law, therefore, was so vague as to have misled the late worthy comptroller, and thus rendered it proper for the last legislature to amend the law, so as to remove all doubt upon the subject for the future, I have arrived at the conclusion that this claim for a preference cannot be sustained under the original act; and that the holders of all the circulating notes were entitled to be paid rateably, in case of a deficiency of the fund, whether the notes held by them had or had not been protested.

The motion to dissolve the injunction is, therefore, denied.