JAMES L. ADAMS *et al.*

*v.*

JAMES M. ROBERTSON *et al.*

1. CONFLICT OF LAWS. The laws of every country allow parties to enter into obligations with reference to the laws of the country where such obligations are to be performed; and although such obligations may not be in accordance with the laws of the country where they are made, as regards obligations to be performed in that country, they may be strictly in accordance with such laws as to obligations to be performed in other countries.

2. SAME. But a limitation in the laws of all nations of the right to enter into contracts to be performed in other countries, requires that they shall be in accordance with the laws of the country where they are made, or else in accordance with the laws of the country where they are to be performed.

3. SAME. The rights enforced by courts where contracts are made in one country to be performed in another are those given by the law of the country where the contract was made, and such rights are enforced in the country where the contract is to be performed, not as a matter of right, but as a matter of comity extended toward the country where the contract was made.

4. SAME. Where a contract is made in one State for the payment of interest in another, at a higher rate than is allowed by the laws of either State, the fate of the contract depends upon the laws of the State where it was made. It is the laws of that State that have been violated.

5. USURY. In a contest between two creditors as to the proceeds of a security held for the benefit of both, one creditor cannot raise against the other the question of usury in behalf of the debtor. The debtor must assert his own rights.

6. CREDITORS. Where an absolute deed was made to the President of a bank who thereupon gave back a defeasance undertaking to reconvey upon the payment of what the debtor owed the bank and another creditor, the presumption is that the bank and the other creditor were to share *pro rata* in the proceeds of the security.

7. WRITTEN INSTRUMENTS—*parol evidence.* Written instruments are made to express the agreements of parties, and the safety of the community requires allegations of mistakes in them should be regarded only where the evidence is clear, free from suspicion, and entirely satisfactory.

APPEAL from the Circuit Court of Douglas county; the Hon. O. L. DAVIS, Judge, presiding.

This was a proceeding in chancery commenced in 1849 for the purpose of settling the rights of different creditors in the proceeds of a mortgage which had been given for their common benefit. The facts are substantially as follows :

In February and March, 1856, James M. Robertson, then a resident of Indiana, was indebted to the Prairie City Bank as *acceptor* of three bills of exchange, to wit: One drawn by John Vestal, dated August 7, 1855, due December, 1855, for $2,000; one drawn by Barney Allen, dated August 29, 1855, due January 1, 1856, for $3,000; one drawn by himself at thirty days, dated November 10, 1855, for $2,000, and as *drawer* of another bill dated August 20, 1865, due January 24, 1856, for $4,550. In the aggregate $11,650.

These bills were all purchased by the bank from Robertson, at about the time of their several dates, and were drawn in Indiana, payable in the city of New York, and were based upon actual transactions, to-wit: The shipment of hogs and cattle. The rate upon which the bills were taken was as follows : Upon the 30 day bill, interest in advance; upon the other bills interest and one-eighth of one per cent. per month, which was the customary bank rate in Terre Haute for time bills on New York.

The Prairie City Bank was a banking corporation of the State of Indiana, at Terre Haute, having authority " to carry on the business of banking by discounting bills, notes, &c.;" " by *buying* bullion, coin, and *bills of exchange;*" entitled " to charge and receive for moneys loaned, interest at a rate not exceeding 6 per cent. per annum," and having power to hold real estate for security, &c., in the name of the President.

Complainants were at the time stockholders of the bank, owning a majority of the stock, and Graham, a member of the firm, was one of the Board of Directors, C. W. Barbour was President, and John S. Beach, Cashier.

The first three bills were not paid at maturity, and Robertson asked for renewal, which the bank refused without further security. So soon as Robertson made default, Barbour wrote to Graham, then at New Orleans. Graham came up

in February, and he and Barbour sent for Robertson, who came at once to the bank, and a negotiation was made by which Robertson agreed to give to the bank a deed for his land in Illinois, as security for the bank debt, the debt then to be renewed, and also to secure anything that he might owe to the complainants.

Complainants had made advances to Robertson upon hogs, which were then at a packing house in Terre Haute. At the then prices there would have been no liability, but by the subsequent decline in prices the debt became $2,300.

Robertson says it was the distinct understanding that the bank debt was to have priority in the security. Barbour does not remember that anything was said about it.

At a meeting of the Board of Directors in February, Graham being present, Barbour presented to the board the proposition of Robertson, that he would give to the bank a deed of his land as security for the bank debt, and that the bills should be renewed. The board accepted the proposition, and instructed Barbour to obtain the deed. Graham advocated and voted for it. Nothing was said about the debt to complainants. In March, 1856, Robertson executed to Barbour, *as President*, the deed, and on same day Barbour gave to Robertson a defeasance, stipulating that upon the payment of the bank debt, setting out the time, and also " what may be due to Graham & Buckingham," the land should be reconveyed. On the 28th of March Barbour presented the deed to the board, representing that it was taken as security for the bank debt—nothing being said about the debt to complainants. The deed was acepted, the renewals made, and the old bills surrendered to Robertson. In June, the first payment of $4,500, mentioned in the defeasance, was made to the bank. That afterwards, in February, 1858, the deed to Barbour being incorrect in its description of the land, a reformed deed was made to S. S. Early, *as President*, he being the successor of Barbour in that office.

Graham & Buckingham, the complainants, filed the bill to foreclose the mortgage, making Robertson, the bank,

Barbour, Early and Bryan defendants. At the August term, 1860, the bank filed its cross bill; and, upon the written stipulation of parties, the cause was heard upon the right of the bank and complainants to a decree against Robertson and Bryan, agreeing that their own right and equities should be afterwards determined " without regard to the form and substance of the pleadings." A decree was therefore made for the sale of, the land, and the property bid in by agreement in the name of S. S. Early, for the benefit of the parties, according as their respective rights and equities should be settled by the court.

Messrs. GOOKINS, THOMAS & ROBERTS for appellants, submitted the following points and authorities :

Bill of foreclosure, by Adams *et al. v.* Robertson, the mortgagor, Barbour, a trustee of both parties, and Early, trustee and President of the Prairie City Bank, a mortgagee in the same mortgage. There was a decree, sale, the property bought in, in trust for both mortgagees, and is held subject to the disposition of the court. The only question in this court is as to the relative rights of the mortgagees in the property. The mortgage consisted of a deed, absolute on its face, and a separate defeasance. Both parties claim priority in the security.

1. The deed, and a written defeasance of the same date, were, as appellants insist, made at the same time, and constitute the mortgage. This the appellees deny, and seek to prove by parol that the defeasance was made subsequently. They bear the same date, refer to the same subject matter, appear to be one, and their legal effect cannot be changed by parol. *Austin* v. *Sawyer*, 9 Cow., 39.

2. The bank is not entitled to priority in the security, for—

*First,* Supposing the parol evidence competent, the whole evidence shows to be parts of one transaction.

*Second,* The deed and defeasance constituting the mortgage, the appellees could have a priority only by reforming it. *Davis* v. *Cox,* 6 Ind., 481.

*Third,* It could not be reformed, nor were the appellees entitled to any affirmative relief, on the pleadings. *Ballance* v. *Underhill,* 3 Scam., 453; *Tarleton* v. *Vietes,* 1 Gilm., 470, 472; *Broadwell* v. *Broadwell,* Id., 603.

*Fourth,* If the instrument could be reformed, in the present state of the pleadings, it could be done only on proof of fraud, or mistake. The proof must be clear, and not conflicting, and the diligent only are entitled to relief against frauds and mistakes. Story's Eq. Jur., 152, 146, 149; *Broadwell* v. *Broadwell,* 1 Gilm., 599.

The bank was in possession of evidence bearing on this question, which it withheld. Every intendment will be indulged against one who withholds evidence, in his possession, which would explain controverted questions. 2 Cow. & Hill's Phillips, 293; 3 Cow. & Hill's Phillips, 1193; 9 Ind., 323, 332; 7 Wend., 31.

3. The bank is not entitled to participate in the security until the complainants are paid in full.

*First,* It took more than six per cent. interest on its loans to Robertson. The appellees claim there was no loan to Robertson, but a purchase of bills from him. The bills were all accommodation bills, and had no obligation as contracts, until discounted by the bank. It was, therefore, a loan of money. *Bank of Indiana* v. *Ross,* 1 Blackf., 315; 8 Cow., 669, 686, 697; 2 Denio, 621; 15 Johns., 57; 6 Ind., 233, 234–5.

*Second,* The bank, under its charter, could take no more than 6 per cent. interest. 1 R. S. Ind., 1852, p. 157, sec. 20.

*Third,* More than 6 per cent. interest having been taken, the contract is *ultra vires* and void. *U. S. Bank* v. *Owens,* 2 Pet., 527; *Bank of Chilicothe* v. *Swayne,* 8 Ohio, 286; *Orr* v. *Lacy,* 2 Doug., (Mich.) 353; *Metropolitan Bank* v. *Godfrey,* 23 Ill., 579, 602; 1 Wend., 56; 7 Id., 31.

4

The appellees cite *Billingsley* v. *The State Bank*, 3 Ind., 375. That cannot aid *in giving effect to the contract*, for a foreign law is not noticed, unless alleged and proved.  *McAllister* v. *Smith,* 17 Ill., 328.

As an *authority* it is a mere *dictum*, and is over-borne by the numerous authorities opposed to it.

*Fourth,* The complainants can. take advantage of this defect in the security of the bank.   It could only have affirmative relief by filing a cross bill, to which the complainants would have been defendants.   It is not, therefore, like a bill to redeem a usurious mortgage.   Our position is strictly that of a defendant.   Conceding (which we do not admit) that a contract *ultra vires* stands on the same footing as one void for usury, still, one in privity of contract, or estate, may insist that the security is void.   *Jackson* v. *Dominick*, 14 Johns, 435 ;   *Cole* v. *Savage*, 10 Paige, 583 ; *Dix* v. *Van Wyck*, 2 Hill, 522 ; *Scott* v. *Lloyd*, 4 Pet., 205 ; *Stafford* v. *Vail*, 22 Ill., 327 ; *Morse* v. *Hovey*, 9 Paige, 197 ; *Jackson* v. *Tuttle*, 9 Cow., 233 ; *Post* v. *Dart*, 8 Paige, 639.

*Fifth,* The contract is void by the law of New York, where the bills were payable.   2 R. S., N. Y., 181–2, p. sec. 1, 2, 5.

*Sixth,* If the contract was usurious, and it is governed by the law of Indiana, the bank can only recover the principal, without interest.   1 R. S. Ind.. 1852, p. 344, sec. 4.

4.   On the face of the security, the complainants are entitled to priority.   The debt of the complainants was due when the mortgage was given, for if a party has broken his contract, an action lies at once.   *Fox* v. *Kitton*, 19 Ill., 519.

5.   On promise to pay, no time being limited, an action may be brought as soon as it is made.   Story on Pro. Notes, sec. 30.

This, then, was a mortgage to secure a debt then due to complainants, and those due to the bank, (as it claims,) in

instalments, due in the future. In such case they are regarded as successive mortgages.   *Vansant* v. *Allman,* 23 Ill., 30.

6. The decree should not have been based upon the amount of the commissioner's sale.

Mr. BALLARD SMITH, for appellees, submitted the following points and authorities :

1. *First,* Complainants cannot plead usury, Robertson having in his answer expressly denied it, and having expressly refused to recognize such a defense.

The rule is, that " a usurious contract can only be avoided by the party who made it, or by some one standing in *legal privity* with him, and not by a mere stranger to the transaction." 22 Ill., 329; 8 Paige, 641; 11 Ind., 402; 4 Dana, 177. " No person can set up the defense of usury, but *a party* to the usurious contract, or one who represents him as a *privy in blood or estate.*" 4 Barb., 341; 1 Barb., 278; 7 Hill, 391; 8 Paige, 641.

Thus, as to the contract, a surety can plead usury. 9 Paige, 198; 7 Hill, 405. As to the property, one who is privy in representation, as the executor ; or in blood, as the heir; or in estate, as the grantee. 14 John, 435. A creditor who has obtained execution, may seize and sell the property of the debtor, and set up the defense of usury against the prior incumbrancer, 2 Hill, 525; 9 Cowen, 233; for the reason that " a purchaser under an execution is an assignee by operation of law, and he stands in *legal privity* with him." 2 Hill, 525.

But the creditor acquires the privity by the sale and purchase. 8 Paige, 641. To constitute the *legal privity,* there should be title to the land. 2 Hill, 526 ; 13 Mass., 515.

Hence a mere mortgagee has no *legal privity* with the debtor in the land. A mortgage is a mere chose in action — a security only. 2 Barb. Chy. Rep., 135 ; 4 Kent Com., 160.

The Supreme Court of the United States say that "it is *perfectly established,* that the plea of usury is *personal* and peculiar, and however a third person, having an interest in the land, may be affected incidentally by a usurious contract, *he cannot take advantage of the usury,*" 10 Wheat., 393; which ruling is expressly affirmed by the Court of Appeals of New York. 2 Selden, 352-3. I can find no case where it has ever been held that a mere mortgagee can plead usury; but, on the contrary, in 1 Barbour, 271, where "it was a contest between two creditors in respect to the surplus produced by a sale on a mortgage," "it was decided that as between two incumbrancers, the subsequent incumbrancers were strangers to the first contract, and could not avoid it for usury;" and this ruling is referred to approvingly by the Court of Appeals. 2 Seld., 354.

*Second,* It is well settled in New York, that persons who accept a lien upon, or interest in, the equity of redemption of mortgaged premises, *as mortgagees* or purchasers, expressly subject to the lien of the prior mortgagee, *cannot avail* themselves of usury in such mortgage." 2 Selden, 347; 8 Paige, 642; 9 Paige, 145; 10 Paige, 591; 2 Denio, 598; 2 Com., 131.

For the reason, that if they take, with the understanding that the other shall also be paid, they cannot be heard to the contrary.

The evidence is clear in this case, that the mortgage in question is taken to the bank to secure the bank debt, with the knowledge, and at the especial instance of the complainants, through their partner and agent, Graham, and that the private negotiation by him with Robertson, as to the debt of complainants, was made with the express understanding that the bank debt should be secured by the deed, "with interest *at the customary bank rates.*" 4 Barbour, 495. *They* cannot now be permitted to avoid that agreement.

*Third,* It is a settled maxim, that "a usurer cannot plead usury." When these bills were bought by the bank, complainants owned more than one-half of the stock of the bank,

and, of course, were the owners of more than one-half of the bills, which stock they have since assigned, and their assignees, of course, became entitled to complainant's interest in the bills. In New York, it is held that " where a transaction is usurious, no one *who has been connected with the transaction,* or who stands chargeable with notice, can set up the defense. 5 Barb., 660-1.

So the Court of Appeals held that " the borrower may set up usury for the purpose of avoiding a contract tainted with it, but the lender cannot. 5 Selden, 243 ; 4 Barb., 346.

It would be against equity to permit complainants, who were directly connected with the purchase of the bills, to set up this defense against their own assignees, 1 Story Eq. Juris., sec. 301, particularly as Graham was one of the directors, and is presumed to have had notice.

*Fourth,* Where a party comes into a Court of Equity seeking relief against a usurious contract, the only terms upon which the court will interfere, are, that he will pay what is really and *bona fide* due, deducting usurious interest. 1 Story Eq. Juris., sec. 301; 3 Barb., Chy., 641 ; 8 Paige, 548.

The statute of New York changed this law so far as to permit *borrowers* to rely upon this defense in chancery, without the tender of the amount borrowed, and legal interest, 11 Wendell, 331 ; but the rule applies to all other persons. 3 Barb. Chy., 641.   The term *borrower,* applies only to the party borrowing, his sureties, heirs, devisees and personal representatives, 7 Hill, 391; and not to grantees. Id.; nor to mortgagees, 3 Barb., Chy., 641.

Complainants file their supplemental bill, alleging usury, asking a discovery, and praying that the bills may be avoided on the ground of usury; but they are neither the borrowers, sureties, heirs, devisees, nor personal representatives, and, therefore, such prayer cannot be entertained, without their first paying, or offering to pay, the sum actually borrowed, and interest, 7 Hill, 391, which they have not done.

2.   There was no usury in the transaction.

The mortgage was taken to secure the first four bills, and the question of usury is confined to these bills ; the renewals being subsequent to the security, cannot affect it.   5 Wend., 597.

The bill for $4,500 was paid at its maturity, and of course that is not questioned.

The bill for $2,000, at thirty days, was bought at the rate of six per cent. per annum in advance, one per cent. less than the New York rate, and cannot be questioned.   3 Wendell, 408; 4 Wendell, 652.

So that the question of usury is confined to the other two bills—one for $2,000, and one for $3,000—which were taken at interest, and one-eighth of one per cent. per month, equivalent to seven and one-half per cent. per annum, which was the customary bank rate at Terre Haute for time bills on New York, at the time of purchase.

It is clear that there was no *actual* corrupt or usurious interest; that the question of usury is merely technical; and that the whole burden of the proof rests upon the complainant.

The ground upon which complainants rely is, that the bills having been bought of the acceptor, he appearing as their owner, they had no existence before the discount, and, therefore, the transaction was but a loan of money, and the bank could not recover more than at the rate of seven per cent. per annum.

The rule in New York is, that where " a note or bill is *accommodation paper* "—that is—" where it is made for the purpose of raising money upon it," " having no existence until discounted, and depending upon a valid discount for its life," and is discounted at a higher premium than the legal rate of interest, such discounting would be usurious.   15 Johns., 55, 535 ; 17 Johns., 181; 8 Cowen, 678, 686.

But where the note or bill is *business paper*—that is, " where it was originally given for a legal consideration, it cannot

afterwards become usurious, at whatever rate it may be purchased or discounted." 8 Cowen, 696; 7 Wend., 597; 9 Paige, 481.

" It is well settled that discounting a *business note* at more than seven per cent. interest, is not usury; a note valid in its inception may be bought and sold as a chattel, at its value, real or supposed." 7 Wend.; 257.

The averment of the defendant, Early, in his answer, upon oath, is,: " That at the various times the said bills were taken, they were represented and understood by the said bank, to be based upon actual transactions, to wit: The shipment of hogs to the Eastern market."

And the evidence is, " that at the time these bills were taken, Robertson's business was that of dealing in cattle and hogs, and shipping to the New York market, and that *these bills were* based upon shipments of cattle and hogs.

This is the only evidence in reference to the consideration of the bills; and establishes the fact that they were *business paper*—a legal commodity—and had a valid inception.

The rule of evidence is, that to make out the defense of usury, it is necessary for the party alleging usury " to show that the paper was *not valid* when discounted;" " the presumption is in favor of the validity " of the paper; " it implies a sufficient consideration." 7 Wendell, 257.

It is not proven that it was accommodation paper, nor that it was made for the purpose of raising money, nor that it had no validity until discounted. The only proof is, that Robertson sold the bills to the bank, and got the proceeds; that so far as the bank knew, he was the owner of the bills, and that the bank regarded the other parties as sureties.

So far as the other parties were concerned, Robertson being the acceptor of the bills, they were his sureties to the bank, and were properly so regarded.

The question is, the bills being based upon actual transactions, does the fact that they were sold by the acceptor, he holding himself out as the owner, and receiving the proceeds, make them void, if a greater rate than legal interest was reserved ?

It would be difficult to find an authority in favor of such a proposition. Certainly there is none in any of the New York reports. On the contrary, it is well settled law, that, " when a bill has been created, according to the custom of merchants, as a real commercial transaction, it is part of the general circulating medium of the currency, and the acceptor, after its issue, stands with regard to a retransfer of it to himself in the same position as any other person." " He may discount it, and if he discounts it, he may re-issue it." 36 Eng. Law and Eq., 563; 7 Mess. & Wels., 174; 11 Ind., 533. That is, that the acceptor of a bill, may, at any time before its maturity, purchase it and re-issue it, and such purchase and re-issue will not affect its validity, it being a marketable commodity. How Robertson acquired these bills is not shown, the complainants, having the opportunity, did not inquire, and they make no proof. But to rebut any presumption, arising from the purchase from the acceptor, that the bills were accommodation paper, the defendant alleged and proved that they were real commercial transactions, based on actual shipments of cattle and hogs—business paper. So that the necessary presumption is that Robertson acquired them by purchase, and was a holder for value; particularly upon a question of usury, where every presumption is in favor of the validity of the bills. 3 Cowen, 284; 22 New York, 472.

It is clear then, from the evidence, that these bills were genuine, having a valid inception, and actual existence, before the sale to the bank; and as such, the bank might, under its charter, and under the laws of New York, buy them at any rate of discount. 3 Edwards' Chy., 146.

*Ultra Vires.*—It was urged by complainants, upon the hypothesis of usury in the original transaction, that the bills were void under the doctrine of *ultra vires.* But it will be conceded that the question whether the bank exceeded its powers in the purchase of the bills, and if so, whether the excess avoids the entire bills, must be determined by the charter of the bank; and it is clear that the decisions of the Supreme Court of the State, which created the bank, must be authoritative in construing the provisions of such charter. 13 Conn., 257.

The question was presented to the Supreme Court of Indiana, upon a similar clause in the charter of the State bank, in the case of *Billingsley* v. *State Bank*, 3 Ind., 376, where the decision of the court below was reversed, and it was held that the taking of usury by the bank was not such excess of power as avoided a contract.

The language of the charter of this bank is : " Such association shall be entitled to charge and receive, for moneys loaned, interest at a rate not exceeding six per centum per annum," 1 Rev. Stat., 157, sec. 22, and of the charter of the State Bank is, " Said bank shall be entitled to charge and receive, for money loaned, six per cent. per annum, and not higher."   Sec. 13 ; Abs. 15, 154; 2 Doug., 2.

The true rule undoubtedly is, " there being no declaration of invalidity in the charter the in-part usurious does not avoid."   40 Maine, 113; 9 Man., 49, 13 C.

So in a recent case in the New York Court of Appeals, it is intimated by one of the judges (COMSTOCK, Ch. Justice) that under the doctrine of *ultra vires,* an excess of power does not avoid the entire contract, 22 N. Y., 269, and the question was left undecided.

The summing up of the question of usury results in this, That

1st. If there be any usury in the transaction, which is clearly not shown, it does not void the charter, because there is no declaration of invalidity therein.   3 Ind., 376

2d. It does not void either the bills or the legal interest under the statutes of Indiana. 20 Ind., 263; 19 Ind., 68, 121.

3d. The complainants. are in no condition to avail themselves of such a plea, either under the decisions of Indiana, or Illinois, or New York.

The opinion in this case was originally prepared by Mr. JUSTICE BECKWITH, and, after a re-hearing at the April term, 1865, adopted, with slight modifications, as the opinion of the court.

OPINION OF THE COURT:

This is a suit in equity, brought to foreclose a mortgage and divide the proceeds arising from the sale between the appellants and the Prairie City Bank, one of the appellees. It appears that Robertson was indebted to the bank in the sum of $11,500, specified in four bills of exchange drawn and accepted in the State of Indiana, and payable in the State of New York. The bank in discounting two of the bills reserved interest at the rate of seven and one-half per cent. The laws of Indiana allow interest to be reserved at the rate of six per cent., and the laws of New York prohibit the taking of a greater rate of interest than seven per cent., under the penalty of the forfeiture of the debt. Robertson was also indebted to the appellants, who were transacting business under the name and firm of Graham & Buckingham, in the sum of about $2,000. On the 20th day of March, 1856, Robertson executed an absolute deed of several tracts of land to Barbour, as president of the bank, and Barbour, on the same day, executed a defeasance undertaking to reconvey the lands to Robertson, upon payment of what he owed the bank, and what he might owe Graham & Buckingham.

The appellants insist that the bank has, under the laws of New York, forfeited so much of the debt due to it as was specified in the two bills of exchange upon which seven and one-half per cent. interest was reserved; and that they were

void for the reason that the bank had no power to reserve a higher rate than six per cent. interest. The appellants also insist that they are entitled to share equally in the benefits of the security taken from Robertson. The bank insists that it has a priority. The bank filed a cross bill against Robertson for a foreclosure of his equity of redemption, and obtained a decree under which the premises were sold and purchased by the appellee, Early, for the benefit of the bank and of the appellants, according to their respective interests, as they might be determined by the court.

Great conflict of opinion has prevailed in respect to the laws affecting the validity of contracts made in one country, but to be performed in another. The laws of the country where a contract is made are obligatory upon the parties; and upon principle no contract declared void by those laws ought to be enforced in any other country. As an exception to the rule, it has been held that no nation is bound to take notice of or protect the revenue laws of another country; but this exception has no foundation in principle, although it is perhaps so firmly established that courts cannot now overturn it. No man ought to be heard in a court of justice to enforce a contract founded in or arising out of moral or political turpitude, or in fraud of the just rights of the country in which the contract was made. Story's Conf. Laws, p. 345. The laws of every country allow parties to enter into obligations with reference to the laws of the country where such obligations are to be performed; and although such obligations may not be in accordance with the laws of the country where they are made as regards obligations to be performed in that country, they may be strictly in accordance with such laws as to obligations to be performed in other countries. The right to enter-into contracts with reference to the laws of another country is one allowed by nations for the convenience of those transacting business within their respective territorial limits, to enable them to obtain such rights as they could have secured in the country where the contract is to be performed, by a just observance of its laws. No nation can be

justly required to allow persons subject to its laws to enter into contracts without reference to and not in accordance either with its own laws or with the laws of the country where the contract is to be performed. A limitation in the laws of all nations of the right to enter into contracts to be performed in other countries, requires that they shall be in accordance with the laws of the country where they are made, or else in accordance with the laws of the country where they are to be performed. The laws of a country have no extra-territorial force, and do not prohibit persons from doing any act or making any contract in another country. The courts of one country may refuse to enforce contracts made in another country where they are immoral or unjust, or where the enforcing of them would injure the rights, interest or convenience of that country or its citizens; but the laws of a country, as such, have no operation or effect upon acts done or contracts made beyond its territorial limits. The rights enforced by courts where contracts are made in one country to be performed in another, are those given by the law of the country where the contract was made, and such rights are enforced in the country where the contract is to be performed, not as a matter of right, but as a matter of comity extended towards the country where the contract was made. Persons making contracts with reference to the laws of the country where such contracts are to be performed, may expressly or impliedly stipulate for the rights and benefits given by the laws of that country, as a part of the contract, and the laws of the country where the contract is made secures to the parties the rights and benefits thus agreed upon in the same manner as if the laws in reference to which they contracted were incorporated into the contract.

In determining the consequences attendant upon making a a contract in one country to be performed in another, which is not in accordance with the laws of either country, we should ascertain which country's laws have been violated. As, for example, the laws of Illinois allow parties to contract for interest at the rate of ten per cent., while the laws of

New York allow only seven per cent. Persons who make contracts in Illinois for interest at the rate allowed by its laws, violate no law of the State of New York, and are not subject to the penalties imposed by the laws of that State upon persons who enter into contracts within its territorial limits in violation of such laws. A creditor who has made no contract in New York does not violate its laws by receiving money from his debtor in that State, or undertaking in another State to receive it there. The laws of Indiana allow persons to contract for interest at the rate of six per cent., in case the contract is to be performed in that State, and at the rate of seven per cent. if the contract is to be performed in New York, but prohibit contracting for a greater rate of interest in either case. Persons entering into contracts in Indiana reserving a greater rate of interest than is allowed by its laws in such cases, thereby violate laws of the State, and incur the penalties imposed for such violation. The courts of neither State will enforce the contract, because the rights asserted under it are in violation of the laws of the State where it was made. The fate of such a contract depends upon the laws of the place where it was made, being subject to the legal consequences attendant upon the violation of those laws. *Andrews* v. *Pond,* 13 Pet., 65. In *Smith* v. *McAllister* (17 Ill. Rep., 328,) this court held that pleas setting forth that the bills of exchange upon which suit was brought were made in Illinois and payable in the State of New York, under a contract not in accordance with the laws of either State, ought not to have been stricken from the files for immateriality. While the reversal of the judgment in the court below upon that ground was undoubtedly correct, upon a careful review of the subject, we are not satisfied with all the reasons given on that occasion. We are of the opinion that the consequences of entering into the contract in that case should have been determined by the law of the place where the contract was made.

The appellants cannot object to the bank's taking the bills of exchange in question and security for their payment, nor

question its authority so to do. No illegal interest was taken from them, and none is sought to be taken from them. They are not at liberty to assert Robertson's rights.

The presumption arising from the defeasance executed by Barbour is that the bank and the appellants were to share equally in the benefits of the mortgage security. 1 Story's Eq., 64; 9 Paige, 360. It is unnecessary for us to consider whether parol evidence is admissible to rebut such presumption and establish an agreement giving the bank a priority without a reformation of the defeasance, as the bank may in its defence to the appellants' bill show that the instrument does not truly express the agreement of the parties owing to fraud, accident or mistake. The counsel of the bank urged in argument that it was not known to its board of directors that the conveyance was taken as security for the debt due to the appellants; that Graham, who was one of the directors, was present at a meeting of the board when it was determined to take the security, and did not disclose that it was to be taken for the benefit of his firm; that Barbour, without its knowledge, executed the defeasance in its present form; and that, supposing the security was taken for its own benefit, the bank surrendered to Robertson the bills of exchange which it then held, and thereby discharged the liability of the endorsers thereof. There is no doubt of the fact that the appellants were in some manner to participate in the benefits of the security. Robertson, Barbour, the written memorandum made at the time, and the defeasance drawn from it, all agree that the appellants were in some manner to be interested in the security. The board of directors consisted of nine persons, five of whom it is presumed were a quorum. The arrangement to take the security was made between Robertson and the directors before they convened in the bank to act upon it formally. It is evident that Barbour, Graham and Farrington, three of the directors, knew the precise nature of the arrangement, and it is highly probable that Turner, another director, was also aware of it.

Before any fraud should be presumed, we ought to be informed who were present at the meeting of the board of directors, and there should be some inquiry whether those present did not understand that the appellants were to share in the benefits of the security. Barbour, the president, was present, and laid the matter before the board as an arrangement already agreed upon, and only wanting its formal sanction. The details of the arrangement were not stated by Barbour, and under the circumstances we may reasonably infer that the members of the board who were present understood them. If the details were understood, there was no occasion for explanations, and a sufficient reason why none were made is furnished by the presumption that none were necessary. The answers of the bank admit that by the original agreement with Robertson, the appellants were to have an interest in the security, and do not assert that any fraud was practiced upon the directors by not disclosing that fact to them. Barbour is an intelligent and highly respectable witness, and it might have been shown by him what directors were present at the meeting, and whether they were acquainted with the nature of the arrangement which they sanctioned. We cannot infer that a fraud was committed upon the directors by the non-disclosure of the interest of appellants in the security, where no such fraud is asserted in the answer, and where no inquiry has been made of those whose testimony might establish or refute it. The allegations that the defeasance was fraudulently drawn by Barbour, so as to give to the appellants and the bank equal rights in the security, and that Barbour misled the board of directors in regard to its terms, are not sustained by the evidence. It is evident that Barbour drew the defeasance in accordance with what he understood was the agreement, and he afterwards informed his co-directors that Robertson had executed the deed according to the understanding between the parties. As Mr. Beach, the cashier, knew nothing of the debt to the appellants, or of any arrangement by which they were to have an interest in the security taken, he naturally supposed it was

solely for the benefit of the bank.    His error in this respect arose from his want of information.    Graham was not present when the deed was executed, or at any of the conversations between Barbour and his co-directors subsequent thereto, and the bank cannot abridge the appellants' rights on the ground that its directors were misled by its president. The appellants did not mislead the bank, and they are not responsible for the conduct of its officers.

The bank further alleges that the defeasance was by mistake so drawn as not to express the true agreement between the parties.    Written instruments are made to express the agreements of parties, and the safety of community requires allegations of mistake in them should be regarded only where the evidence is clear, free from suspicion, and entirely saisfactory.    Parties after the lapse of time, and under other circumstances, may differ widely as to the terms of an agreement, and experience has demonstrated the necessity of preserving them in a repository more safe than the recollection of witnesses.    A written instrument is made a repository for that purpose, with a distinct understanding that its contents are to be the sole and only evidence of the agreement, and that if difference should arise as to what they were, the instrument containing them is to be the criterion by which the rights of the parties are to be determined. We have in the case under consideration precisely the difference which the law so wisely endeavors to avoid in the use of written instruments.    Robertson, after the lapse of years, and now he is endeavoring to extricate his sureties from liability, upon his obligations to the bank, says that the defeasance does not express the true agreement between the parties.    With the defeasance in his possession he discovered no mistake therein until he failed to exonerate his endorsers from their liability.    Barbour, who executed it, says that it was drawn in accordance with the verbal agreement.

The evidence shows that Robertson was desirous to have the bills of exchange held by the bank, and then past due, renewed, and that he was to give personal security for the

payment of the bills taken in renewal to the satisfaction of the bank. Graham, who owned a majority of the stock of the bank, desired to secure the debt due to his firm, and was willing to have the bank renew Robertson's bills upon satisfactory personal security, if his own debt was secured. A memorandum of the arrangement was made, from which the defeasance was drawn, and although it was not signed, it was preserved by the bank, and would at least test the accuracy of Barbour's recollection in regard to the transaction. The bank has not produced the memorandum, and has given no satisfactory reason for withholding it. Under these circumstances, we are of opinion that the evidence is not of a character or sufficiently clear and satisfactory to establish a mistake in drawing the instrument selected by the parties to express their agreement.

The court below will ascertain the amount due the appellants for principal and interest, and direct the lands held by Early in trust for the parties, according to their respective rights, to be sold without redemption. From the proceeds there will be deducted the complainants' costs in this court and in the court below, and the costs of sale; also the taxable costs of the complainant in the cross bill filed by the bank, and the costs of the sale made under the decree therein; the costs to be paid to the parties respectively entitled to the same. The residue of the proceeds will be divided *pro rata* between the appellants and the bank. Should a surplus remain after such division, the same will be paid over to Robertson, or to such person as may hold and be entitled to his equity. .

Inasmuch as there is no claim for an account of rents and profits of these lands set out in the complainants' bill, we cannot direct any decree to be made in respect to them.

The decree of the court below is reversed and the cause remanded, with instructions to enter a decree in conformity with this opinion.

*Decree reversed.*